383 F.3d 861
 Florence R. PRESCOD, individually and as successor in interest to Caroline Neischer, deceased; Oswald Rodrigues; Orin Rodrigues; Godfrey Rodrigues; Sandra Allison; Portia Ann Kennard Smith, Plaintiffs-Appellees,
v.
AMR, INC., dba American Airlines; British West Indies, dba BWIA, Defendants-Appellants.
 No. 02-55097.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 5, 2003.
 Submission Vacated June 3, 2003.
 Resubmitted April 8, 2004.
 Filed August 19, 2004.
 
 COPYRIGHT MATERIAL OMITTED Stephen J. Fearon and John Maggio, Condon & Forsyth, New York, NY, for the defendants-appellants.
 Bruce J. Altshuler, Brown, Altshuler & Spiro, Beverly Hills, CA, for the plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California; Christina A. Snyder, District Judge, Presiding. D.C. No. CV-99-00496-CAS.
 Before: HALL, THOMPSON, and BERZON, Circuit Judges.
 PER CURIAM:
 
 
 1
 For most travelers affected by air carriers' misplacement of luggage, the inconvenience is a fleeting nuisance. In the case before us, however, the district court found that the defendant Airlines' failure to ensure that Caroline Neischer's bag remained in her possession was a substantial cause of Neischer's death nine days after the bag's confiscation, because the bag contained "a life-sustaining breathing device and related medicine." The defendants appeal this determination, challenging whether Neischer's death resulted from an "accident" as defined by the Warsaw Convention,[1] and, if so, whether there was "willful misconduct."[2]
 
 BACKGROUND
 
 2
 On December 14, 1997, Caroline Neischer, a 75-year-old trained nurse with chronic respiratory problems, flew from Los Angeles ("LAX") to New York ("JFK") on American Airlines ("AA"). She then transferred to a BWIA (West Indies) International Airways ("BWIA") flight that took her via Port-of-Spain, Trinidad to Georgetown, Guyana in South America. This case arises out of Neischer's death on December 23, 1997, after five days of hospitalization. The suit was brought by plaintiff Florence Prescod, decedent's daughter, her four siblings, and one of decedent's adult grandchildren.
 
 
 3
 Prescod accompanied Neischer to LAX on the day of her journey. She testified that at LAX she told AA ticket agent Timothy Hansell that her mother's rollaway suitcase contained a breathing device[3] and medication and should therefore stay with her on the flights ahead (as it had for trips in 1995 and 1996). Prescod informed Hansell that her mother was asthmatic and asked: "Would you please call New York and let them know that this passenger has this bag that has to be with her at all times." Prescod observed and overheard Hansell conveying this request by telephone. She had Hansell write the name of his New York contact, Dane Ligoure, down for her.[4]
 
 
 4
 As arranged by Prescod with the LAX gate agent, the bag accompanied Neischer on the LAX-JFK flight leg. A wheelchair booked by Hansell with his counterpart at JFK met Neischer on arrival, as AA operates BWIA's baggage handling and other ground operations at JFK. At some point during the connection to her BWIA flight, Neischer was required to relinquish her suitcase to an unidentified AA or BWIA employee.[5] She was given a receipt for the bag. The unidentified employee — according to testimony from decedent's son, Orin Rodrigues, who met her in Georgetown — "promised her that the bag would be with her in Guyana as soon as she arrives."
 
 
 5
 The bag failed to arrive with Neischer in Georgetown the next morning, December 15. Neischer's four checked bags were also missing. Rodrigues filed a "Property Irregularity Report" with BWIA, indicating that among the contents of the lost baggage was "medication" and a "life support machine." A BWIA ground representative "promised [Rodrigues] that [the bag] would be on the next flight," which was scheduled for later in the day.
 
 
 6
 During this litigation, in response to an interrogatory, BWIA stated that it undertook "normal tracing action ... in an effort to determine the whereabouts of the missing baggage." At trial, BWIA's Miami station manager, who formerly worked at JFK, testified that the recovery of a bag with vital contents "would be the highest priority that I could think of." He added, however, that at busy times such as the holiday season "other avenues" are sometimes explored to reunite passengers with lost bags, including transporting luggage by truck to Miami as a transit point for delivery.
 
 
 7
 After arriving at Rodrigues's house, Neischer used her inhalers from the handbag she had retained and, according to her son, "was breathing a little bit short but[she was] mostly agitated." After Rodrigues called BWIA and learned that the bag was not on the following flight, but, again, assuredly "would be on the next plane," Neischer became"[m]ore agitated." This telephone routine was repeated on the morning of December 16, when Rodrigues was told that the bag had failed to arrive on the overnight flight.
 
 
 8
 By then, Neischer had begun to exhibit palpitations. During the day, Neischer called her daughter in Los Angeles in a state of anxiety about her missing bag; she was "crying, very exasperated." Neischer did not sleep on the night of December 16th due to worry and/or illness. Neischer had her son call BWIA frequently until he learned at 6 A.M. on the morning of December 17th that the bags had arrived. Rodrigues immediately retrieved the luggage and his mother started to use her medication and breathing device. He described her as becoming "calm ... less agitated."
 
 
 9
 Neischer was admitted to hospital the next day with respiratory distress, and died on the evening of December 23. The district court admitted as a dying declaration Neischer's statement, related by her son, that "if they had not taken my bag from me, this would not have been possible."
 
 
 10
 The day Neischer arrived in Georgetown was national election day in Guyana. After Rodrigues called BWIA for a second time — on the morning of December 16 — he went into Georgetown to look for a replacement inhaler for his mother. He testified that "the city was in turmoil ... [t]he downtown pharmacies were all closed down ... there was a riot pending in the city. All the stores were barricaded with[steel]." Rodrigues did find an open pharmacy "on the outskirts of town" and purchased an inhaler. Asked why he did not take his mother to a doctor, Rodrigues testified that
 
 
 11
 after being promised that the bags would be delivered at any said moment ... I knew from past experience that once mom had her medications, everything would be all fine. And most of all secondly, as we spoke about the riot that was in the town, I did not want to take my mother in such a crisis area... all the doctors and medical physicians are all stationed in Georgetown. So I think it's kind of impossible to get her to a doctor then.
 
 
 12
 Extensive medical evidence was introduced at trial. Neischer's doctor, Waymon Merrill, testified that she had "chronic lung disease — asthma ... and high blood pressure." He described Neischer as "always remember[ing] her medication." Dr. Merrill last examined Neischer six days before her departure for Guyana. At that visit, Dr. Merrill cleared Neischer to travel after he found her medical condition to be stable: "her lungs were clear at the time and her heart had a normal rhythm," with normal respiration.
 
 
 13
 Plaintiffs also presented the testimony of Dr. Sheldon Spector, an asthma and pulmonary medicine expert. He had communicated with Dr. Merrill and had reviewed Neischer's pertinent medical records, except for missing documentation from the Georgetown hospital where Neischer died. Dr. Spector characterized the removal of Neischer's medication and breathing device as "quite probabl [y] ... a substantial factor in causing her death." He concluded that "taking away her medication was playing a very big role" in contributing to Neischer's death.
 
 
 14
 The defense's medical expert, pulmonary specialist Dr. Michael Lieber, disagreed. Dr. Spector's diagnosis was that Neischer was an asthmatic rather than a sufferer of Chronic Obstructive Pulmonary Disease ("COPD"), which encompasses emphysema and chronic bronchitis.[6] Dr. Lieber, unlike Dr. Spector, had examined Neischer's chest X-rays and testified that she suffered from COPD and emphysema. Consequently, Dr. Lieber opined, "the immediate cause of death was myocardial infarction," commonly known as a heart attack: "It's well-known that most patients with COPD also have heart disease because th[e] same things cause them." Dr. Lieber also thought that Neischer caught an infection on the airplane that caused her respiratory difficulties. He asserted that Neischer's inability to clear mucous from her lungs "contributed to [her] feeling more short of breath but not directly to her death." Dr. Lieber acknowledged that "[i]t's possible that [the] heart attack was brought on by respiratory difficulties," but added that the care in Guyana had been "terrible." Ultimately, Dr. Lieber ruled out Neischer's missing medication as a substantial cause of her death, because in his view she didn't have asthma and possessed the primary respiratory medication she needed, in her inhaler, during and after her trip.
 
 
 15
 Dr. Spector responded that: "I think it's over interpretation to say that [ ] there's something — because she's frothing at the mouth, that it's really a heart problem that she died of. I think all the other data [including the impressions of the Guyanese doctor and the death certificate[7]] would say that, indeed, it was the pulmonary problem that led to the heart problem."
 
 
 16
 The defense also presented another medical expert, Dr. Balwant Singh, a doctor from Guyana, who testified that the medications and breathing device needed by Neischer were readily available and inexpensive in Georgetown. Dr. Singh stated that although "individual access [to medications] may have been interfered with" during Guyana's election unrest, medication would "certainly" have been available and doctors accessible.
 
 
 17
 The district court, in a bench trial, found for the plaintiffs. Applying the Warsaw Convention, the court held that the case fell under Article 17 (passenger death), and not under Article 19 (delayed baggage). In concluding pursuant to Air France v. Saks, 470 U.S. 392, 406, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), that an "accident" had occurred for purposes of Convention liability, the court stated that "when the unknown JFK agent ... took Ms. Neischer's bag from her and checked it, this event was `unusual or unexpected and external' to her." Citing Husain v. Olympic Airways, 116 F.Supp.2d 1121, 1135 (N.D.Cal.2000), the district court concluded that "when a flight attendant's acts create a foreseeable risk of injury to a passenger, an `accident' occurred."
 
 
 18
 The court made factual findings that Neischer suffered both from asthma and from emphysema and that she was
 
 
 19
 fully dependent on her medication, such that the deprivation of the medicine could cause serious adverse medical consequences which, when coupled with the anxiety induced by the loss of the medication and breathing apparatus, could contribute to her rapid decline. Further, it appears that Ms. Neischer's death was caused by the congestive heart failure resulting from her pulmonary problems rather than as the result of a simple heart attack. Therefore, had the accident not occurred, the Court finds that it is probable that she would not have died....
 
 
 20
 Concerning causation, the court "applied regular proximate cause analysis" to find that "defendants' seizure of Ms. Neischer's carry-on luggage containing her breathing device and medicine, and her subsequent deprivation thereof for two days was a significant contributing factor in her death." Drs. Spector and Lieber's respective testimony was recapitulated, with the court noting that "[a]lthough Dr. Lieber disagreed with Dr. Spector and Dr. Merrill, Ms. Neischer's primary care physician, that she was asthmatic, he admitted that if she were, there would be `significant untoward side effects' if she were deprived of her medicine. In addition, Dr. Lieber admitted that Ms. Neischer's medications were `efficacious' in treating her condition for the six years preceding her death."
 
 
 21
 The district court concluded that the $75,000 liability limit imposed by Article 22 of the Warsaw Convention was inapplicable because the Airlines committed "wilful misconduct" under Article 25.[8] The court found that "Plaintiff Prescod's explicit instructions to Timothy Hansell that the breathing device and medication were to remain with her mother at all times establish that defendants were informed that Ms. Neischer had a medical problem and that the bag contained a lifesustaining breathing device and related medicine. Therefore, the Court concludes that, at the time the bag was taken from Ms. Neischer, the risk of taking it was `obvious,'" and the confiscation amounted to willful misconduct. This appeal ensued.
 
 DISCUSSION
 
 22
 * A. "Accident" under the Warsaw Convention
 
 
 23
 Article 17 of the Convention states that: "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." We review de novo the legal question of whether an "accident" occurred. See Husain v. Olympic Airways, 316 F.3d 829, 835 (9th Cir.2002), aff'd 540 U.S. 644, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004).
 
 
 24
 The Supreme Court recently examined Article 17 in a case involving an on-board death caused by an asthmatic man's exposure to second-hand smoke while seated in a nonsmoking section three rows in front of the aircraft's smoking section. See Husain, 540 U.S. 644, 124 S.Ct. 1221, 157 L.Ed.2d 1146. The passenger's wife repeatedly asked airline employees to move her husband away from the smoking section and was told that the flight was full, even though there were empty seats on the plane. Id. at 1224, 1225 n. 2. The Court recounted that Air France v. Saks, 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), had "explained that the term `accident' in the Convention refers to an `unexpected or unusual event or happening that is external to the passenger,' and not to `the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft.'" Husain, 540 U.S. at ___, 124 S.Ct. at 1224. "[F]or purposes of the `accident' inquiry, ... a plaintiff need only be able to prove that some link in the chain [of injury causation] was an unusual or unexpected event external to the passenger." Id. at 1227 (quotation marks and citation omitted).
 
 
 25
 Here, the seizure of Neischer's carry-on bag, and the subsequent delay in the bag's delivery, occurred after a sequence of promises by defendants' employees to Neischer: (1) that her bag would remain with her in the airplane cabin on all flights; and (2) that the bag, which was eventually removed from Neischer's possession and checked, would accompany her on the same flight in the aircraft's hold. Given these representations by defendants' employees, the seizure of Neischer's bag was a qualifying "accident" under the Convention for several reasons.
 
 
 26
 First, just as in Husain,"[t]he rejection of an explicit request for assistance would be an `event' or `happening' under the ordinary and usual definitions of these terms," id. at 1229, so the defendants' failure to comply with a healthbased request to ensure that Neischer's bag travel with her was an "event."
 
 
 27
 Second, the event was "unusual or unexpected." While baggage removal and delivery delays are routine in air travel, the atypical aspect of this case was the promises made by defendants' employees that the bag would not be taken from Neischer and would not be delayed. In light of defendants' employees' knowledge of Neischer's need for the bag and the ensuing promises regarding it, removing the bag from Neischer's possession was "unusual or unexpected." Airlines do not usually take steps that could endanger a passenger's life after having been warned of the person's special, reasonable needs and agreeing to accommodate them.[9]
 
 
 28
 Third, the "unusual or unexpected event" was external to Neischer, for the same reason the refusal of assistance in Husain was external to the decedent in that case: In each instance, the preexisting illness was a contributing cause of death, but the airline's "unusual or unexpected" action, external to the individual, was also"a link in the chain of causes" producing the injury. See id. at 1228. Under the Convention, the "accident" need only be such a link; that the plaintiff's own pre-existing condition was also a cause does not matter. Id. at 1227-28.
 
 
 29
 Similarly, the fact that Neischer's bag was delayed subsequent to the "accident[al]" seizure is immaterial. The question of whether the later delay of the bag fits under the Convention's definition of "accident" is not relevant pursuant to Husain, as the seizure standing alone was a"link in the chain of causes" leading to Neischer's death. Husain emphasized that "[i]n Saks, the Court recognized that any one of these factual events or happenings may be a link in the chain of causes and — so long as it is unusual or unexpected — could constitute an `accident' under Article 17." Id. at 1228 (emphasis added).
 
 
 30
 In the context of the promises made to Neischer and Prescod, the seizure of Neischer's bag therefore amounts to an "accident" under the Convention, as it took place "in the course of any of the operations of embarking." See Lathigra v. British Airways PLC, 41 F.3d 535, 539 (9th Cir.1994) ("Once the passenger presents herself to the carrier or its agents as ready to begin the air journey, the Convention['s] ... provisions apply until completion of disembarkation at the destination airport.").[10]
 
 
 31
 Neischer's death, as opposed to the relevant accident, did not have to occur during the time periods specified in the Convention to be actionable. Instead, an airline can be liable for a passenger's delayed reaction to an "accident which caused the damage so sustained," so long as the accident took place, in the plain language of Convention Article 17, "on board the aircraft or in the course of any of the operations of embarking or disembarking."
 
 
 32
 The defendants contend, citing Marotte v. American Airlines, 296 F.3d 1255, 1259 (11th Cir.2002), that a Convention "accident" must cause an injury at the required times of embarkation, flight, and disembarkation. Marotte stated that "to satisfy Article 17's carrier liability provision, a plaintiff must establish three requirements: (1) an `accident' must have occurred; (2) injury or death must have occurred; and (3) the preceding two conditions must have occurred while'embarking or disembarking' or during the flight itself." Id. However, nothing in Marotte turned on whether the injury or death, as opposed to the accident, occurred during embarkation or thereafter. As Marotte had no occasion specifically to consider the sequential question we face, prong (3) of the Marotte test is best regarded as dicta.
 
 
 33
 This characterization has particular force because the plain language of Article 17 — specifying only that the "accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking" — demonstrates that Marotte's third requirement is overly narrow. The Convention does not state that the ultimate injury or death, as opposed to the relevant accident, must occur at any particular time following the accident. Instead, a passenger's delayed reaction to an Article 17 accident resulting in injury or death is actionable so long as the accident itself took place "on board the aircraft or in the course of any of the operations of embarking or disembarking." These conditions are satisfied here.
 
 B. Causation
 
 34
 Reviewing the district court's conclusion on proximate cause for clear error, Husain, 316 F.3d at 835, we find none. "[I]t is for the district court to resolve the factual disputes and to draw inferences from the proof ... [and] the district court's findings are plausible in light of the record viewed in its entirety...." Id. The medical evidence is conflicting, but "the district court, as the trier of fact, was in the best position to determine which of two plausible explanations was correct." Id. at 839. We find no merit in defendants' contention that it was clear error for the district court to credit plaintiffs' expert medical testimony. Cf. Kennedy v. S. Cal. Edison Co., 268 F.3d 763, 768 (9th Cir.2001) (discussing California standard of competent medical testimony).
 
 
 35
 Substantial record evidence also supports the conclusion that, when the defendants' employees seized Neischer's bag rather than allowing it to accompany her on board, there was a foreseeable risk of substantial delay in the bag's delivery. The Airlines' refusal to permit the bag to be carried on board proximately caused the delay, which in turn was shown at trial to be a cause of Neischer's death. See Husain, 540 U.S. at ___, 124 S.Ct. at 1228 (recognizing that "there are often multiple interrelated factual events that combine to cause any given injury"). Had Neischer been allowed to carry her bag on board at JFK, as promised by defendants' employee at LAX, the ensuing delay could not have occurred, and Neischer would have had her complete medical supplies on arrival. The district court therefore properly concluded that the seizure of Neischer's bag proximately caused her death.
 
 C. Willful Misconduct
 
 36
 Nor did the district court clearly err in concluding that defendants' misconduct was willful. We apply California law to this inquiry. See Dazo v. Globe Airport Sec. Servs., 295 F.3d 934, 940 (9th Cir.2002). "Determining willful misconduct is based on a subjective standard and can be satisfied through circumstantial evidence." Husain, 316 F.3d at 839.
 
 
 37
 Defendants do not contend that Neischer voluntarily relinquished her bag, or that their employees were unaware of her medical condition. Neischer was repeatedly promised action that was or should have been within the defendants' power to deliver. "The usual meaning assigned to `wilful,' `wanton' or `reckless,' ... is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." New v. Consol. Rock Prods. Co., 171 Cal.App.3d 681, 689, 217 Cal.Rptr. 522 (1985) (quoting PROSSER, LAW OF TORTS § 34, at 185 (4th ed.1971)); see also Dazo, 295 F.3d at 941 (discussing California standard of willful misconduct). In light of Prescod's representations concerning her mother's health, and the promises made to Neischer, the seizure of Neischer's bag meets the standard of willful misconduct.
 
 D. Contributory Negligence[11]
 
 38
 Article 21 of the Warsaw Convention states that: "If the carrier proves that the damage was caused by or contributed to by the negligence of the injured person the court may, in accordance with the provisions of its own law, exonerate the carrier wholly or partly from his liability." At trial, the district court once alluded to contributory negligence by suggesting that the Guyanese hospital's substandard care might have been a contributing factor to Neischer's death. The language of Article 21, however, indicates that it is only Neischer's negligence that is relevant, as she is the "injured person."
 
 
 39
 Plaintiffs concede that contributory negligence was raised in the defendants' answer and argued at trial. There is evidence from which a trier of fact could have found that Neischer's own negligence was partially responsible for her death. For example, Dr. Singh testified that breathing devices were readily available in Guyana at a cost of $2, and Prescod testified that on a prior visit to Guyana her mother had purchased replacement medication.
 
 
 40
 Despite this evidence, the district court failed to address the defendants' contention that Neischer did not act to avoid potential injury. As a result, we remand for further proceedings on the issue of contributory negligence. Cf. Husain, 116 F.Supp.2d at 1145 (finding, in a holding that was not appealed, that the decedent's negligence contributed "at a rate of 50%" to his death).
 
 CONCLUSION
 
 41
 For the reasons stated, we affirm the district court in part, and reverse in part. Each party shall bear its own costs.
 
 
 42
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934),reprinted in note following 49 U.S.C. § 40105.
 
 
 [2]
 We address these issues in this opinion. We decide the parties' claims about damages in a concurrently filed memorandum disposition, which addresses the defendants' remaining contentions in this appeal as well as those raised in the plaintiffs' cross-appeal, No. 02-55131
 
 
 [3]
 The "breathing device" was a "pulmonary aid/medicine nebulizer." Plaintiffs' medical expert analogized the function of the device to "a bronchial toilet as if you're flushing things out of the lung that have accumulated." Neischer's son, with whom she stayed in Guyana, testified that on previous visits Neischer "never lost [sight] of the little ... machine." Neischer's grandson, who lived with her in Los Angeles, testified that she used this device frequently and had it with her "[a]ll the time," along with her regular medication
 
 
 [4]
 This individual was not traced by AA, but Hansell identified his handwriting of the name
 
 
 [5]
 This was most likely an AA employee, as BWIA ordinarily had only a supervisor at the JFK gate
 
 
 [6]
 Dr. Spector noted consistency with other evaluations when testifying that "this diagnosis has been going on for years." In addition, he stated that even if Neischer did have COPD, his conclusion concerning substantial cause of death would be the same
 
 
 [7]
 These documents mention COPD as a cause of death and also reference the stress of air travel. COPD and emphysema were recorded in some of Neischer's emergency room reports. Dr. Spector testified in response that: "Often I must say in medicine, if you know that somebody is a smoker and they have lung disease that you almost invariably put down COPD without much more thinking about it."
 
 
 [8]
 Article 25 states:
 (1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.
 (2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment.
 
 
 [9]
 The Fifth Circuit's decision inBlansett v. Continental Airlines, Inc., 379 F.3d 177 (5th Cir.2004), is not comparable, as in Blansett"no request was made of the airline; the flight staff was entirely passive." Id. at 180.
 
 
 [10]
 As we have concluded that the "accident" here was the seizure of Neischer's bag, not the delay in returning it to her — which was only a further link in the chain of causation — we need not consider the pertinence of Convention Article 19: "The carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage, or goods."
 
 
 [11]
 The defendants contend that California law of comparative negligence applies under the Convention's contributory negligence provisionCf. Husain, 116 F.Supp.2d at 1141 ("Both parties agree that the Court should apply California's comparative negligence standard in this case rather than a traditional contributory negligence standard."). We need not decide this question in the first instance.