# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 1, 2012

Lyle W. Cayce
Clerk

No. 11-20843

TAMALA WHITE; SHAWN CARRIKER; ROBERT CARRIKER, Individually and as Representatives of the Estate of Carol Wilson,

Plaintiffs - Appellants

v.

EMIRATES AIRLINES, INCORPORATED,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:10-CV-2635

Before KING and HIGGINSON, Circuit Judges, and FOOTE, District Judge.[*]
PER CURIAM:[**]

Emirates Airlines passenger Carol Wilson suffered a heart attack shortly before her flight from Dubai landed in Houston. She died soon thereafter. Wilson's son, Shawn Carriker, together with her other children, brought suit against Emirates Airlines pursuant to the Convention for the Unification of Certain Rules for International Carriage by Air. They alleged that the flight

---

[*] District Judge of the Western District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-20843

crew's response to Wilson's emergency constituted an "accident" under Article 17 of the Convention, and that this "accident" caused Wilson's death. The lower court granted Emirates Airlines' summary judgment motion, holding that the crew's response was not an "accident" under Article 17. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 13, 2010, Plaintiff-Appellant Shawn Carriker ("Carriker") and his mother, seventy-year-old Carol Wilson ("Wilson"), traveled on Emirates Airlines ("Emirates") Flight 211 from Dubai to Houston. As the plane began its descent into Houston, Wilson left her seat to use the lavatory. Approximately five minutes later, a flight attendant checked the lavatory and found that Wilson had collapsed while inside. The flight attendant summoned Carriker. Carriker observed that Wilson's breathing was shallow and her eyes were unfocused. Carriker tried to communicate with Wilson, but was unsuccessful. Raed Abdallah ("Abdallah"), the lead flight attendant, was called upon to assist. Wilson was taken out of the lavatory and placed on the ground, face-up, in the aisle.

With roughly ten minutes remaining until the plane was to land in Houston, Abdallah began to administer emergency aid to Wilson, guided by Emirates' "In-Flight Services Cabin Crew Emergency Manual" (the " Emirates Manual"). The Manual contains procedures to be followed when a passenger has collapsed, as reflected by the acronym "DRS ABCD." The acronym stands for the following steps: (1) Assess Dangers, (2) Check Responses, (3) Shout for Help, (4) Open Airway, (5) Check Breathing, (6) Start CPR (if no breathing), and (7) Use Defibrillator. These steps are to be performed during the "primary survey." As part of a "secondary survey," to be performed when there is no longer a threat of immediate danger, the crew is directed to monitor the passenger's vital signs. If necessary, the crew is also directed to contact MedLink (a medical advice

No. 11-20843

service), inquire into whether a medical professional is onboard, and request medical assistance upon arrival.

Although the parties dispute the exact measures that members of the flight crew (including Abdallah) undertook, there is no genuine dispute that the crew (1) removed Wilson from the lavatory and placed her on the floor, (2) administered oxygen through a mask, and (3) alerted the captain, who notified medical personnel at the airport. The crew instructed Carriker to return to his seat due to the imminent landing. The parties disagree as to whether members of the flight crew stayed with Wilson and monitored her vital signs after Carriker returned to his seat, though Carriker acknowledges that a flight attendant was no more than two feet away from Wilson during landing. The plane landed in Houston approximately ten to fifteen minutes after the crew first discovered Wilson in the lavatory.

After landing, EMS personnel boarded the plane and took over Wilson's care. The captain ordered all passengers to remain seated until EMS could board. Carriker disembarked and waited in the jetway. Although Wilson was conscious and responsive when EMS arrived, she lost consciousness when she was placed in a wheelchair. The paramedics performed CPR on Wilson after they removed her from the plane, but did not use a defibrillator. Wilson was taken to a nearby hospital, and died two days later. No autopsy was performed, but the probable causes of death were listed as a myocardial infarction, cardiogenic shock, metabolic acidosis, and respiratory failure.

Carriker and Wilson's other children[1] filed suit against Defendant-Appellee Emirates pursuant to Articles 17 and 21 of the Convention for the Unification of Certain Rules for International Carriage by Air ("Montreal

---

[1] Tamala White and Robert Carriker, individually and as representatives of Carol Wilson's estate, are also named plaintiffs in this case. For simplicity's sake, we will refer to the Plaintiffs-Appellants as "Carriker."

3

No. 11-20843

Convention"). The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and Emirates moved for summary judgment. The magistrate judge granted Emirates' motion and dismissed the lawsuit, concluding that Carriker had not shown a genuine issue of material fact as to whether Wilson's death was caused by an "accident," as that term is used in the Montreal Convention. Carriker timely appealed.

## II. STANDARD OF REVIEW

This court reviews a lower court's grant of summary judgment de novo. *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 836-37 (5th Cir. 2009). Summary judgment is appropriate if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(a). "A factual dispute is 'genuine' if a reasonable trier of fact could return a verdict for the nonmoving party." *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008). In considering a summary judgment motion, this court views the evidence in the light most favorable to the nonmoving party. *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).

## III. DISCUSSION

### A.    Background

The United States is a party to the Montreal Convention, which governs the international air carriage of passengers, baggage, and cargo. The Convention provides an airline passenger's exclusive remedy; a passenger may not maintain "an action for personal injury damages under local law when her claim does not satisfy the conditions for liability under the Convention." *El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999). Under Article 17 of the

No. 11-20843

Convention, air carriers are liable for "accidents" that injure passengers while they are boarding, aboard, or disembarking a flight. Article 17, as officially translated from the governing French text, provides:

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Convention for the Unification of Certain Rules for International Carrier by Air, art. 17(1), May 28, 1999, reprinted in S. TREATY DOC. NO. 106-45 (2000), 1999 WL 33292734, at *33 (1999).[2] The Montreal Convention replaces the "Warsaw Convention and all of its related instruments and . . . eliminate[s] the need for the patchwork of regulation and private voluntary agreements." *Id.* at *7. Nevertheless, "[i]t is expected that [Article 17] will be construed consistently with the precedent developed under the Warsaw Convention and its related instruments." *Id.* at *16.

The Montreal Convention does not provide a definition of the word "accident," as used in Article 17. The Supreme Court has, however, addressed the meaning of the term in two decisions: *Air France v. Saks*, 470 U.S. 392 (1985), and *Olympic Airways v. Husain*, 540 U.S. 644 (2004). In *Saks*, the plaintiff experienced pressure in her left ear as her flight landed in Los Angeles. 470 U.S. at 394. She disembarked the plane without informing Air France personnel of her discomfort. *Id.* When Saks consulted a doctor five days later, the doctor found that Saks had become permanently deaf in her left ear. *Id.* The Supreme Court considered whether Saks's injury constituted an "accident" under Article 17. In concluding that it did not, the Court reasoned that "liability under Article 17 of the Warsaw Convention arises only if a passenger's injury is caused

---

[2] The Montreal Convention entered into force in the United States on November 4, 2003. *See* U.S. DEP'T OF STATE, TREATIES IN FORCE 332 (2011).

by an *unexpected or unusual event or happening that is external to the passenger.*" *Id.* at 405 (emphasis added). The Court further explained:

> This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries. . . . In cases where there is contradictory evidence, it is for the trier of fact to decide whether an "accident" as here defined caused the passenger's injury. But when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply.

*Id.* at 405-06 (citations omitted). Recognizing the difficulty in proving causation, the Court reasoned that the passenger is required only "to prove that some link in the chain was an unusual or unexpected event external to the passenger." *Id.* at 406. Because Saks's injury was not caused by an "unexpected or unusual event or happening that is external to the passenger," the Court concluded that it was not an "accident." *Id.*

The Court again interpreted Article 17 in *Olympic Airways v. Husain*, 540 U.S. 644 (2004). There, the plaintiff and her husband traveled on an Olympic Airways flight from Egypt to the United States. *Id.* at 646-47. The plaintiff's husband was an asthma sufferer whose condition was aggravated by cigarette smoke. *Id.* Because Olympic Airways permitted smoking on its international flights, the couple requested seats in the non-smoking section. *Id.* They were assigned seats a mere three rows away from the smoking section. *Id.* at 647. The plaintiff told a flight attendant that her husband was allergic to smoke, and asked that he be moved farther away from the smoking section. *Id.* The flight attendant refused and stated that the flight was full, even though seats were in fact available. *Id.* at 648, 648 n.2. The plaintiff's husband ultimately died aboard the flight as a result of an asthma attack. *See id.* at 648. On appeal, the Supreme Court considered whether a "carrier's unusual and unexpected refusal to assist a passenger is a link in a chain of causation resulting in a passenger's

pre-existing medical condition being aggravated by exposure to a normal condition in the aircraft cabin." *Id.* at 646. The Court first clarified that, under *Saks*, "it is the cause of the injury—rather than the occurrence of the injury—that must satisfy the definition of 'accident.'" *Id.* at 650 (citing *Saks*, 470 U.S. at 399). The Court then explained, "[t]he relevant 'accident' inquiry under *Saks* is whether there is 'an unexpected or unusual *event or happening.*' The rejection of an explicit request for assistance would be an 'event' or 'happening' under the ordinary and usual definitions of these terms." *Id.* at 654-55 (citation omitted). Because the flight attendant's rejection of Husain's request was "unexpected or unusual," the Court held that it constituted an "accident" under Article 17. *Id.* at 657.

## B.    Analysis

On appeal, Carriker argues that his case is analogous to *Husain*, as the flight crew's response to Wilson's emergency constituted an unexpected or unusual event or happening that was external to the passenger. Specifically, Carriker faults the flight crew for (1) refusing his request for medical assistance and (2) failing to follow Emirates' policies in attending to Wilson. Emirates responds that its reaction to Wilson's medical emergency cannot be considered an "accident" unless that reaction was so thoroughly deficient as to be considered unexpected or unusual under the circumstances.

### 1.    Refusal of Request for Medical Assistance

Carriker contends that he requested that the flight crew perform CPR or use a defibrillator on Wilson, and that the flight crew's non-compliance with his request constituted an "accident" under Article 17. In addition to *Husain*, he relies upon *Yahya v. Yemenia-Yemen Airways*, No. 08-14789, 2009 WL 3424192 (E.D. Mich. Oct. 20, 2009), and *Prescod v. AMR, Inc.*, 383 F.3d 861 (9th Cir. 2004) (per curiam), to support this position. In *Yahya*, a flight crew refused to divert a flight after being apprised of a passenger's life-threatening condition,

and instead told the passenger to wait approximately ninety minutes for the plane to arrive at its planned destination in Yemen. The passenger died before the plane landed. 2009 WL 3424192, at *1. In finding that this conduct, if proved, would constitute an Article 17 "accident," the court reasoned, "[u]nder *Husain*, the [flight] crew's decision not to [divert] the airplane . . . constitutes an 'event or happening' required for an 'accident' to be found under Article 17 of the Montreal Convention." *Id.* at *6. In *Prescod*, an airline lost a passenger's essential medical bag after promising the passenger that the bag would travel with her. The passenger arrived at her destination without the bag and later died because she lacked access to her medical supplies. 383 F.3d at 863-66. The court found, after a bench trial, that this incident constituted an "accident" because although airline employees knew the passenger needed the bag, and had promised her that she could keep it with her, they nevertheless took it from her and subsequently lost it. *Id.* at 868-70.

The factual circumstances before us are distinguishable from the scenarios presented by *Husain*, *Yahya*, and *Prescod*. Here, the undisputed facts demonstrate that the Emirates flight crew responded to Carriker's request for medical assistance. Indeed, it is uncontested that the crew took action to assist Wilson during the final minutes of the flight. Abdallah and other crew members moved Wilson to the floor, gave her oxygen, and alerted the captain, who arranged for medical assistance for Wilson once the plane arrived.

Carriker does not deny that these actions occurred. Rather, he faults the flight crew for failing to do more. In his deposition, he stated that he "asked [the flight crew] about doing CPR. And – or those – I called them paddle things," but that the flight attendant thought Wilson had just fainted. Abdallah stated in his deposition, however, that he did not commence CPR or defibrillation because Wilson was breathing throughout the incident. Moreover, it is unclear whether Carriker merely asked about the advisability of such procedures or specifically

requested that they be used. Regardless, Carriker is not a medical professional, and the crew's decision not to comply with his requests was not unexpected or unusual, given that both parties acknowledge that Wilson was breathing when she was discovered in the lavatory. In fact, the record demonstrates that EMS personnel never used a defibrillator on Wilson, even after they removed her from the plane and assessed her vital signs. In light of these circumstances, the crew's response to Wilson's emergency was not so unexpected or unusual as to constitute an "accident" under Article 17.

Our conclusion is consistent with the decisions of other circuits, which have reasoned that even a flight crew's arguably imperfect response to a passenger's medical emergency does not necessarily constitute an Article 17 "accident." In *Hipolito v. Nw. Airlines, Inc.*, 15 F. App'x 109 (4th Cir. 2001) (per curiam), for example, a passenger who suffered an asthma attack aboard an international flight was unable to obtain the voltage necessary to operate his nebulizer. *Id.* at 110. In responding to the emergency, a flight attendant provided the passenger an oxygen bottle, but it proved inoperable. The flight attendant then sought the assistance of several doctors onboard. Two doctors attended to the passenger and administered oxygen and other medications, but the passenger nevertheless died. *Id.* at 110-11. Applying *Saks*, the court granted summary judgment for the airline, agreeing with the district court's assessment that the flight attendant's failure to provide a fully functional bottle of oxygen was "not the type of external, unusual event for which liability is imposed under the Warsaw Convention." *Id.* at 112.

In another case, a passenger suffered a heart attack while aboard an international flight from Miami to Frankfurt. *Krys v. Lufthansa Ger. Airlines*, 119 F.3d 1515 (11th Cir. 1997). When he first began to feel ill, the passenger contacted a flight attendant, who requested assistance from several doctors onboard. *Id.* at 1517. A doctor attending to the passenger initially determined

that the passenger was not in danger, so the flight crew—ostensibly relying on the doctor's  opinion—declined to make an unscheduled landing. *Id.* at 1517. After arriving as planned in Germany, the passenger was transported to a hospital where doctors concluded that he had suffered a heart attack. *Id.* When the passenger subsequently sued the airline for its response to the emergency, the Eleventh Circuit affirmed that, on these facts, the flight crew's "continuation of the flight to its scheduled point of arrival" was not an "accident." *Id.* at 1522.

Other courts have arrived at similar conclusions. *See Rajcooar v. Air India Ltd.*, 89 F. Supp. 2d 324, 328 (E.D.N.Y. 2000) ("A heart attack does not meet th[e] definition [of 'accident'] . . . . Nor does allegedly inadequate medical care without some showing of unexpected circumstances.") (citations omitted); *Abramson v. Japan Airlines Co., Ltd.*, 739 F.2d 130, 133 (3d Cir. 1984), *abrogated on other grounds by El Al Isr. Airlines, Ltd.*, 525 U.S. at 160-61 (holding that a flight attendant's refusal to allow a passenger to lie down to alleviate a medical condition did not constitute an "accident," and explaining, "[i]n the absence of proof of abnormal external factors, aggravation of a pre-existing injury during the course of a routine and normal flight should not be considered an 'accident' within the meaning of Article 17").

Even in the midst of an imminent landing, the flight crew here did far more in response to Wilson's incident than did many of the crews confronted with medical emergencies in the cases we have reviewed. While different circumstances might have required the Emirates crew to take further steps to assist Wilson, under the circumstances presented in this case, the magistrate judge properly concluded that the crew's actions were not so unexpected or unusual as to constitute an "accident" under Article 17.

## 2.    Failure to Follow Policies and Procedures

Carriker also argues that the flight crew's failure to follow the policies set forth in the Emirates Manual constituted an unexpected or unusual event.

No. 11-20843

Carriker specifically takes issue with the crew's alleged failure to monitor Wilson's breathing and pulse rates in accordance with airline policy, or to seek assistance from a medical professional onboard. Emirates responds that an airline's failure to follow its own procedures or industry standards does not necessarily constitute an "accident" under the Montreal Convention.

Carriker relies principally on *Fulop v. Malev Hungarian Airlines*, 175 F. Supp. 2d 651 (S.D.N.Y. 2001). There, a passenger had a heart attack shortly after his flight departed from Budapest. *Id.* at 652. Contrary to established airline procedure, the crew decided not to divert the flight after consulting a doctor onboard. *Id.* at 652, 664. The court denied the airline's motion for summary judgment with respect to the plaintiff's Article 17 claim, allowing for the possibility that an airline's failure to abide by its own procedures respecting flight diversion in response to a medical emergency could constitute an "accident" under certain circumstances. The court reasoned that "the ordinary traveler reasonably would expect that . . . in handling life-threatening exigencies, airlines . . . would be particularly scrupulous and exacting in complying with their own industry norms, internal policies and procedures, and general standards of care." *Id.* at 665. Accordingly, the court concluded, an airline's "alleged deviation from its own rules and standards that were in place to deal with passengers stricken by medical emergencies may be sufficient to support a determination that such an event . . . was unusual or unexpected, and thus an accident . . . ." *Id.*

Carriker's reliance on *Fulop* is misplaced, as this court rejected its *per se* approach in *Blansett v. Cont'l Airlines, Inc.*, 379 F.3d 177 (5th Cir. 2004). There, the plaintiff suffered an episode of deep vein thrombosis ("DVT") aboard a flight, resulting in a stroke. *Id.* at 178. The likelihood of DVT is heightened by pressurized conditions on a plane, and at the time of the injury, certain airlines (but not Continental) had added DVT warnings to their pre-flight instructions.

11

*Id.* Nevertheless, federal law did not require such warnings. *Id.* at 178-79. The plaintiff brought suit, alleging that Continental was liable for his injury. *Id.* As framed by this court, the case presented the question of "whether Continental's failure to provide warnings and instructions concerning DVT could have constituted a covered 'accident' under article 17." *Id.* at 179.

The court held that Continental's failure to warn of DVT did not constitute an "accident." The court first distinguished the case from *Husain*, explaining that, in the case before it, unlike in *Husain*, "no request was made of the airline; the flight staff was entirely passive." *Id.* at 180. The court then reasoned:

> [T]he Supreme Court has held that some kinds of inaction can constitute an "accident." In *Husain*, specific refusals to render requested aid constituted an "unexpected or unusual event." We take note also of the Court's mention of the example proffered by the district judge *a quo* in [*McCaskey v. Cont'l Airlines, Inc.*, 159 F. Supp. 2d 562, 574 (S.D. Tex. 2001)], in which he speculated that it would be an "unusual and unexpected event" if an air crew decided not to divert a flight to save the life of a passenger who suddenly became ill. In *Husain* and the *McCaskey* hypothetical, unusual circumstances existed to elevate the willing inaction of airline personnel from mere inertia—from a *non-event*—to an event both "unexpected and unusual."
>
> No such circumstances were thrust on the flight crew in the present case, and their compliance with the regular policy of their airline was hardly unexpected. Rather, the Blansetts allege that the "unexpected" nature of the alleged event arose not from the choices of the flight attendants, but from the Continental policymakers who decided not to mandate DVT warnings on Continental flights.

*Id.* at 181 (footnotes and internal citations omitted). The court assumed that Continental's failure to warn of DVT was a departure from an industry standard of care, but rejected the plaintiff's argument that such a departure necessarily constituted an "accident."

In doing so, the court refused to "depart from the demonstrated will of the Supreme Court by creating a *per se* rule that any departure from an industry

standard of care must be an 'accident,'" reasoning instead that "[s]ome departures from an 'industry standard' might be qualifying accidents under Article 17, and some may not." *Id.* at 181-82. The relevant question is whether any particular departure was an "unusual or unexpected event." *Id.* at 182. The court then concluded, "Continental's failure to warn of DVT was not an 'unusual or unexpected event' and not a qualifying 'accident.' Though many international carriers in 2001 included DVT warnings, . . . many did not. Moreover, Continental's battery of warnings was in accord with the policies of the Federal Aviation Administration, which prescribes what warnings airlines should issue to passengers." *Id.* Thus, "[i]t was not an unexpected or unusual decision for Continental merely to cleave to the exclusive list of warnings required of it by the agency that has regulatory jurisdiction over its flights." *Id.* In holding that an airline's unreasonable departure from industry standards did not necessarily establish an unusual or unexpected event, the court cited *Fulop* as an example of the "unreasonable departure" approach it rejected in the aftermath of *Husain.* *Id.* at 180-81 & n.2.

Although *Blansett* addressed departures from industry standards of care rather than departures from an airline's internal policy, its reasoning applies here. As *Blansett* clearly demonstrates, the inquiry for purposes of Article 17 is not whether Emirates failed precisely to adhere to its procedures, but rather whether any such failure constituted an "unexpected or unusual event or happening that is external to the passenger." *Saks*, 470 U.S. at 405.

Even accepting as true Carriker's contention that the Emirates flight crew failed to follow all relevant procedures set forth in the Emirates Manual, we agree with the magistrate judge that, when evaluated in context, the crew's failure to do so was not unusual or unexpected. As noted, the plane was in its final descent when a flight attendant first discovered that Wilson had collapsed in the lavatory. Accordingly, the flight crew's ability to respond was limited by

the short time period in which it had to act and by the need to ensure the safety of other passengers and crew. For instance, because other passengers were required to be seated during landing, it was inadvisable for the crew to seek assistance from medical professionals who may have been onboard. Moreover, it would have made little sense to contact MedLink to obtain advice regarding possible diversion of the flight. Thus, even if we assume the flight crew failed to follow all internal procedures in responding to the emergency, Carriker has not shown that any such departures were unusual or unexpected under the circumstances.

Under *Saks*, courts must apply the definition of "accident" "flexibly . . . after assessment of all the circumstances surrounding a passenger's injuries." *Id*. As evaluated under the unique circumstances of this case, we conclude that the flight crew's failure to follow all Emirates procedures in handling Wilson's emergency did not constitute an Article 17 "accident."[3] Because the flight crew's response to Wilson's medical emergency was not an "accident" under Article 17, we need not consider whether that response constituted a "link in the chain" of causation leading to Wilson's death.  *See id*. at 406.[4]

---

[3] The remaining authorities cited by Carriker involve factual circumstances significantly different from those now before us. *See Fishman v. Delta Air Lines, Inc.*, 132 F.3d 138 (2d Cir. 1998) (holding that the use of a scalding hot compress to ease a child's earache was unexpected and unusual and therefore constituted an "accident"); *McCaskey*, 159 F. Supp. 2d at 574 (holding that "a failure to divert [a flight due to a medical emergency] is not *ipso facto* an accident," but "the notion that a failure to divert can never present a jury question is more than this Court is willing to hold"); *Watts v. Am. Airlines, Inc.*, No. 1:07-cv-0434, 2007 WL 3019344 (S.D. Ind. Oct. 10, 2007) (denying a motion to dismiss where a passenger had a heart attack in an airplane lavatory and was not discovered until after landing). Given the unique factual scenario presented by this case, we draw little benefit from these decisions.

[4] Near the conclusion of her order, the magistrate judge stated that proving the existence of an "accident" establishes only a *prima facie* case of liability, after which the burden shifts to the airline to prove that it took "all necessary measures to avoid the damage or that it was impossible for [the airline] to take such measures." Carriker objects to this statement of the law. The rule upon which the magistrate judge relies originated in Article 20 of the Warsaw Convention, the predecessor to the Montreal Convention. *See* Convention for

No. 11-20843

## IV. CONCLUSION

In light of the foregoing, the judgment of the district court is AFFIRMED.

---

the Unification of Certain Rules for International Carrier by Air, May 28, 1999, reprinted in S. TREATY DOC. NO. 106-45 (2000), 1999 WL 33292734, at *7 (1999); Montreal Convention art. 55. The Montreal Convention lacks a provision analogous to Article 20 of the Warsaw Convention, though it does limit liability to 100,000 Special Drawing Rights per passenger if the carrier can prove that any damage resulting from an "accident" was not due to the "negligence or other wrongful act or omission" of the carrier. Montreal Convention art. 21. Because we find no Article 17 "accident" here, we need not devote further attention to this provision.

15