Joseph **FULOP** and Wanda Phillips, Plaintiffs,

v.

**MALEV HUNGARIAN AIRLINES,** Defendant.

No. 00 Civ.1965(VM).

United States District Court, S.D. New York.

Jan. 27, 2003.

---

Kathleen L. Nastri, Carmody & Torrance, Waterbury, CT, for plaintiffs.

Stephen J. Fearson, Condon & Forsyth, New York City, for defendant.

## *DECISION AND ORDER*

MARRERO, District Judge.

Plaintiffs Joseph Fulop ("Fulop") and his wife, Wanda Phillips ("Phillips," and together with Fulop, "Plaintiffs") instituted this action under the Warsaw Convention (the "Convention") to recover damages for injuries Fulop allegedly sustained when he suffered a heart attack aboard an international flight operated by defendant Malev Hungarian Airlines ("Malev"). The Court granted Malev's motion for summary judgment in part and denied it in part in a Decision and Order dated October 29, 2001[1] (the "Decision"), finding that (i) the unexpected event here that caused an "accident," as defined under the Convention, was not Fulop's heart attack aboard the Malev flight, but rather the alleged aberrant conduct of Malev's employees in handling the occurrence, (ii) triable issues existed regarding whether Malev deviated from its own policies or procedures or applicable industry practices by failing to divert the plane when informed of Fulop's medical condition, and

---

**1.** The decision is reported as *Fulop v. Malev Hungarian Airlines,* 175 F.Supp.2d 651 (S.D.N.Y.2001).

(iii) Plaintiffs' claim of willful misconduct did not create a separate cause of action. The Court held a bench trial (the "Trial") on these issues on January 6–8, 2003. For the reasons discussed below, the Court renders judgment in favor of Malev.

## I. *FACTS*

On March 18, 1998, Fulop was a passenger aboard Malev flight number 90 traveling from Budapest, Hungary to John F. Kennedy Airport ("JFK") in New York (the "Flight"). The flight departed at 11:50 a.m., Budapest Time, and was scheduled to arrive at JFK approximately nine hours later at 3:25 p.m., Eastern Standard Time. Sometime after takeoff, Fulop began experiencing chest pains similar to those he had experienced during a heart attack he had suffered in 1994. In an attempt to alleviate the pain, Fulop took nitroglycerin, which he had carried with him following his first heart attack but which he had not needed to take since. When the pain persisted, Fulop requested assistance from Malev flight attendants and asked if a physician was on the Flight. An announcement was made and Dr. Tamas Lakatos ("Lakatos") responded. Lakatos was an orthopaedic surgeon, not a heart specialist, and had been a licensed physician for fourteen years. He examined Fulop, who had moved and was then lying in a row of empty seats toward the back of the plane. The parties place the time of these events variously at between two to three and a half hours into the Flight, at which point the airplane would have been located over the vicinity of Great Britain or Ireland, or somewhat to the west of those countries.

Fulop recounted his medical history for Lakatos, relating how he had suffered a heart attack and describing the medical procedure that was performed on him after the heart attack. Lakatos took Fulop's vital signs and observed Fulop's physical condition, noting that while Fulop appeared to be in pain, his pulse and blood pressure were normal, and he was not sweating or having difficulty breathing. Lakatos then gave Fulop an injection of a painkiller taken from the Flight's medical kit, and returned to his seat while Fulop remained lying down in the row of empty seats. Twenty minutes later, Lakatos returned to check up on Fulop, and Fulop told Lakatos that he was feeling better. Lakatos confirmed that Fulop's vital signs had not changed, then returned to his seat. Over the course of the flight, Lakatos returned to see how Fulop was doing several times and did not observe Fulop in any apparent distress, even observing that Fulop was asleep during a certain portion of the Flight. Other Malev crew members also kept watch over Fulop during this time.

At some point after Lakatos gave Fulop the painkiller injection, he was brought to the flight deck by the Flight's chief purser, Jozef Tolnai ("Tolnai") to discuss the situation with the captain of the Flight, Werner Janos ("Janos"). While Lakatos declined to tell Janos whether he should or should not divert the plane, he noted that at the moment, Fulop appeared to be feeling better. He added, however, that he could not predict how Fulop would be feeling later on in the Flight. After consulting with Lakatos and other crew members, Janos decided not to divert the Flight, and the Flight continued on its scheduled route.

Not long before the Flight landed at JFK, Fulop again complained of pain. Lakatos returned to examine Fulop again, and gave him another painkiller injection. After consulting with Fulop, Malev personnel arranged for an ambulance to meet the aircraft upon its arrival. After the Flight landed, paramedics examined Fulop and

took him to Mary Immaculate Hospital in Queens, New York. Two days later, Fulop was transferred to Long Island Jewish Medical Center, where he underwent triple bypass surgery.

At Trial, Fulop claimed that upon feeling ill, he asked a Malev crew member to divert the Flight to England because he noticed on the plane's map locator screen that the Flight was then close to England. In contrast, Malev claimed that Tolnai raised the possibility with Fulop and Lakatos of diverting the Flight to land at an airport in Europe, but that both Fulop and Lakatos felt a diversion was unnecessary. Fulop claims that this failure to divert caused permanent damage to his heart that would not have occurred had Malev diverted the Flight and thus enabled him to obtain proper medical treatment sooner, and that by failing to divert, Malev violated both its own procedures and industry standards for dealing with such a medical emergency.

## II. *DISCUSSION*

In assessing Malev's liability under the standard adopted in the earlier Decision, the Court must first determine what policies and procedures govern Malev and the rest of the airline industry in responding to an in-flight medical emergency such as the one here at issue, and then decide whether in dealing with Fulop's condition Malev's employees violated any such applicable standards. In its Decision, this Court found that "aberrant conduct of Ma-

lev's employees in handling the occurrence, the failures of which aggravated Fulop's initial heart attack," could be viewed as an "unusual or unexpected event or happening," thus qualifying as an "accident" under Article 17 of the Convention for which Malev would be liable for any damage sustained as a result. *Fulop,* 175 F.Supp.2d at 663.[2] On the basis of the Trial testimony and corresponding record, this Court is not persuaded that Plaintiffs have met their burden to prove by a preponderance of the evidence that the relevant conduct of Malev's employees violated established operational standards, rules or policies applicable to the circumstances. Thus, the Court does not find that the behavior of Malev's employees in response to Fulop's medical problems qualifies as an "accident" as defined under Article 17 of the Convention, and consequently does not find Malev liable for damages.

Malev's procedures for tending to sick passengers leave the absolute decision-making authority of whether to divert the plane to the captain. (Def.'s Trial Ex. E.) According to the procedures, the captain first must make a request over the loudspeaker for a physician or other trained health professional to assist the sick passenger.[3] (*Id.*) If such a trained health professional is present, she may evaluate the situation and inform the captain of her medical opinion. (*Id.*) The captain then must determine whether or not the sick passenger requires urgent medical assistance. (*Id.*) If he deems such assistance necessary, he must contact the nearest

---

**2.** Among other provisions, the Convention allows passengers injured or killed in an airplane accident to recover damages from the air carrier:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course

of any of the operations of embarking or disembarking.

Warsaw Convention art. 17.

**3.** The evidence indicates that the announcement here was actually made by Tolnai. The Court does not regard such a departure from Malev's guidelines to be sufficiently material to support a finding of liability.

suitable airport and make preparations for an emergency landing. (*Id.*) If the emergency landing is to take place significantly earlier than the originally scheduled landing, the airplane will likely be overweight, and consequently the captain must find an airport that can handle the overweight plane. (Transcript of Trial ("Tr."), at 195–96.) Such a landing is far riskier because of this extra weight, (Tr., at 196), and as a result, the captain sometimes must dump fuel in order to land safely, although such a procedure requires consultation with air traffic control to avoid interfering with other aircraft or with the area below. (Tr., at 258.)

According to the testimony of Malev's expert witness, Captain Douglas Twinam ("Twinam"), airline industry practice for handling in-flight medical problems suggests that any medical professionals on board be consulted for their medical opinion about the sick passenger's condition, and such opinions are then taken into account by the captain, who ultimately decides after weighing all of the circumstances whether to divert the plane. (Tr., at 250–51.) Twinam also noted that if a passenger showed signs of distress or was particularly demonstrative about his condition, this behavior could be a notable factor in the captain's decision-making. (Tr., at 253.) The Court regards Malev's procedures, as described in its flight manual, to be substantially similar to these industry standards.

 The Court does not find sufficient evidence in the trial record to persuade it that Malev's employees materially deviated either from Malev procedures or industry standards in handling Fulop's medical emergency. After being notified that Fulop was feeling ill, Tolnai told Janos and then made an announcement over the public address system that a patient was sick and a doctor was needed. (Tr., at 130–31.)

Lakatos responded to the request for a physician, and went to examine Fulop. Lakatos testified that he found Fulop's vital signs to be "normal," with a normal heart rhythm and pulse, and did not observe Fulop sweating or having difficulty breathing. (Deposition of Tamas Lakatos, M.D., dated July 25, 2002 ("Lakatos Dep."), at 17, 48–49.) Lakatos then injected Fulop with a pain reliever from the on-board medical kit, and twenty minutes later, Fulop reported to Lakatos that he was feeling much better. (Lakatos Dep., at 19.) Both Lakatos and the Malev crew consistently checked on Fulop throughout the Flight, and observed him resting or sleeping and not in any evident distress. (Lakatos Dep., at 23; Tr., at 82, 135.) The moment Fulop did complain of more pain, Lakatos was immediately called to examine Fulop again. (Lakatos Dep., at 24.)

Lakatos also spoke directly with Janos and Tolnai about Fulop, and told Janos that Fulop "had some chest problems and [Lakatos] had given him an injection ... [a]nd it seemed during that period of time that had elapsed that, because of the injection, probably, [Fulop] was feeling better." (Lakatos Dep., at 33.) Lakatos also told the captain he was unable to provide an opinion on whether or not the Flight should be diverted because he could not predict Fulop's future condition during the Flight. (Lakatos Dep., at 34–35.) Janos interpreted this conversation a little more definitively, testifying that "based upon what [Lakatos told him] about the condition of [Fulop], he didn't need any emergency medical care" and the Flight could continue on to the United States. (Tr., at 182.) Tolnai also remembered the conversation with Lakatos differently, testifying that Lakatos told Janos that it was unnecessary to land in Europe and that Fulop concurred in that assessment. (Tr., at 135.) The Court finds Lakatos's testimony

here to be the most objective because, as opposed to the other witnesses, Lakatos is not a party or affiliated with a party here. He therefore stands to lose or gain little from the outcome of the Trial. Thus, accepting Lakatos's version of the events as the most reliable, the Court finds Janos's decision and the process and considerations by which he made it to have followed the established procedures of Malev and the airline industry.

■ Plaintiffs argued at Trial that Lakatos's conversation with Janos signified that Lakatos was trying to convey to Janos some concern about Fulop's safety. (Tr., at 355–56.) The Court is not persuaded that Plaintiffs' interpretation of Lakatos's discussion with Janos is compelled by the testimony, and Plaintiffs provided no proof at Trial to bolster this theory. It is equally plausible that Lakatos was merely providing a cautious opinion, not in order to express specifically directed concern, but because of his desire not to overstate or understate the situation based on the limited ability he had to examine Fulop.[4] Seen in that light, Janos's ultimate decision to continue with the Flight would not have been a choice made in rejecting Lakatos's contrary advice, as Plaintiffs would have the Court believe, but rather a decision made after taking into account, in addition to all other considerations of safety and convenience of other persons on board, the overall thrust of Lakatos's advice, which was that Fulop appeared stable and his condition did not indicate that urgent emergency care warranting a diversion of the Flight was needed at that moment.

■ The Court is further unpersuaded that Plaintiffs proved by preponderance of the evidence that Janos gathered insufficient information to make his decision. Janos spoke with Lakatos, Tolnai, and Agnes Tursics, a Malev purser on the Flight, about Fulop. While Janos did not know and did not inquire about Fulop's medical history, including the fact that he had suffered a previous heart attack, (Tr., at 205), Lakatos had discussed this medical history with Fulop (Lakatos Dep., at 13.) It is logical and reasonable to infer that this history factored into Lakatos's advice to Janos. Indeed, it would be more important for Lakatos to have this information than for Janos because Lakatos would more fully understand the implications of such a history and whether it had a correlation to the chest pains of which Fulop complained. That Lakatos may not have conveyed the information to Janos, insofar as it may have had any bearing on Janos's decision, would not of itself compel a finding of liability on the part of Malev. *See, e.g.,* Aviation Medical Assistance Act of 1998, Pub.L. No. 105–170, § 5(a), 112 Stat. 47 (codified at 49 U.S.C.A. § 44701 (1999)) ("An air carrier shall not be liable for damages in any action brought in a Federal or State court arising out of the performance of the air carrier in obtaining or attempting to obtain the assistance of a passenger in an in-flight medical emergency, or out of the acts or omissions of the passenger rendering the assistance, if the passenger is not an employee or agent of the carrier and the carrier in good faith believes that the passenger is a medically

4. Under the preponderance of the evidence standard, when the Court is faced with two theories equally supportable by the record, the Plaintiff's theory is not accepted because the burden of proof has not been satisfied. *See Kosakow v. New Rochelle Radiology Associates. P.C.,* 274 F.3d 706, 731 (2d Cir.2001) ("[W]here the burden of proof is a preponder-

ance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced."); *United States v. Gigante,* 39 F.3d 42, 47 (2d Cir.1994) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses")

qualified individual.") Moreover, there is no evidence that even if Lakatos had discussed Fulop's prior medical history with Janos, Janos's decision would have been any different given that, notwithstanding the prior condition, Lakatos reported that Fulop said he was feeling better, and was resting without obvious signs of distress. In addition, there is no evidence that Lakatos, not being a cardiac specialist, would have known the necessary implications of Fulop's prior medical history under the circumstances.

■ Regarding whether or not Fulop actually made a request to divert the plane, the Court is equally unpersuaded that his request, if it happened, was demonstrative enough to indicate that his medical condition was so severe as to warrant an emergency diversion. The evidence on this issue is substantially divided and, in the Court's assessment, does not tilt sufficiently to Plaintiffs' case to satisfy the preponderance standard. Tolnai testified that he had raised with Fulop the question of whether he felt that diverting the plane to land in Europe was necessary, but that Fulop and Lakatos both said it was not. (Tr., at 134.) While Lakatos did not mention this conversation with Tolnai and Fulop, he did testify that he could not recollect Fulop ever requesting that the plane be diverted. (Lakatos Dep., at 28.) Meanwhile, Fulop testified that he had made the diversion request only once to a male cabin crew member after Fulop received his painkiller injection. (Tr., at 53.)

The Court does not view these three witnesses as having incompatible recollections. It is possible that Fulop, Tolnai and Lakatos had a conversation initiated by Tolnai's inquiry about diverting the plane, and that Fulop at first responded it was unnecessary, but later changed his mind and expressed such a request. However, even assuming that Fulop did make such a request, commercial flights are not automatically diverted whenever a passenger asks them to be. Along with other factors, among the relevant considerations, according to Malev's expert witness's testimony, is the urgency with which a passenger manifests such a request. Since only the sick passenger can truly know in-flight how seriously ill he feels, some of the burden must fall on him to convey his concerns to the crew.

In the instant case, Fulop testified that his single request to a male crew member was made in a calm, non-aggressive manner, which was consistent with Fulop's non-expressive personality. (Tr., at 34–35.) While Fulop may not have been the type of person to raise his voice, even in an emergency, the Court's own observation of Fulop and his demonstration of the manner in which he asked for the Flight to be diverted illustrates to the Court that a reasonable person, hearing this request, would not necessarily have interpreted it as indicating that a dire emergency demanding such an extraordinary response was involved. Moreover, Fulop's single request to one crew member, not specifically adopted or endorsed by the physician who assessed his medical condition, is not sufficient to establish an urgent matter, and his failure to repeat himself could have been reasonably interpreted by others on board either as a change of mind or as a signal that his condition had improved or was not sufficiently severe to begin with. Consequently, the Court is not persuaded that Malev ignored Fulop's requests for a diversion in a manner that violated its own policies or procedures or any relevant industry standard.

The Court also finds that Plaintiffs' claim of loss of consortium was not supported by any testimony from Phillips or any other evidence from Plaintiffs. Thus,

the Court finds no grounds on the record to support such a claim.

## III. *ORDER*

For the reasons discussed above, it is hereby

ORDERED that the Clerk of Court enter judgment in favor of Defendant Malev Hungarian Airlines.

The Clerk of Court is directed to close this case.

**SO ORDERED.**