Soorajnine **SINGH,** as next friend for Rovin Singh; and Cyndiana Singh, as next friend for her minor children, J.S., V.S., Jy.S., and Ve.S., Plaintiffs,

v.

**CARIBBEAN AIRLINES LIMITED, Defendant.**

**Case No. 13–20639–CIV.**

United States District Court, S.D. Florida.

Signed Sept. 18, 2014.

Christopher Wayne Wadsworth, Raymond Renato Dieppa, Wadsworth Huott,

LLP, John Philip Hess, Miami, FL, for Plaintiffs.

Allison M. Surcouf, John Maggio, Condon & Forsyth, LLP, New York, NY, Robert C. Owens, Homestead, FL, for Defendant.

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

CECILIA M. ALTONAGA, District Judge.

This case concerns claims brought on behalf of Rovin Singh ("Mr. Singh") by his sister Soorajnine Singh ("Ms. Singh"); and on behalf of Mr. Singh's minor children, J.S., V.S., Jy.S., and Ve.S., through their mother, Cyndiana Singh (collectively, "Plaintiffs"); against Defendant, Caribbean Airlines Limited ("CAL"), following Mr. Singh experiencing a massive stroke aboard a CAL flight. The matter proceeded to trial before the undersigned[1] starting on March 12, 2014, and concluding on March 31, 2014.

Three issues were presented at trial. The first was whether the flight crew's response to Mr. Singh's stroke constitutes an "accident" pursuant to the Convention for the Unification of Certain Rules for International Carriage by Air (the "Montreal Convention"), May 28, 1999, S. Treaty Doc. No. 106–45 (2000), 2242 U.N.T.S. 350, such that Plaintiffs may recover damages from CAL. Assuming an accident occurred, the next issue was whether the accident caused Mr. Singh's complained-of injuries. If Plaintiffs prevailed on these first two questions, the last issue was what

amount of damages serves to compensate Plaintiffs for those injuries.

The Court has carefully considered the testimony of the witnesses, the voluminous exhibits admitted in evidence, the parties' written submissions, and applicable law. Based on its review of the record and pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law, answering only the first question.

## I. FACTUAL FINDINGS[2]

Mr. Singh and his sister Ms. Singh, a nurse's aide, were passengers aboard CAL flight BW 484 from Port of Spain, Republic of Trinidad and Tobago ("Trinidad"), to Miami, Florida, on December 15, 2011. At the time, Mr. Singh was a forty-year-old pool contractor, divorced, with four young daughters. His mother died from a stroke at the age of fifty-six. Mr. Singh and Ms. Singh were returning to Miami after having attended a funeral in Trinidad.

Flight BW 484 departed Port of Spain at approximately 7:50 a.m. EST, operated by Captain Shafeez Shageer ("Captain Shageer") and First Officer Monique Nobrega ("Officer Nobrega"). Captain Shageer was a pilot with more than 36 years of experience, and Officer Nobrega was hired to work starting in 1999. Check airman,[3] Captain Yanlal Dass, was also present in the cockpit to monitor Captain Shageer's flight operations that day. Irina Blake ("Blake"), with 27 years of experience, was the purser on the flight; and Doddy Bissoondath–Santiago ("Bissoondath–Santiago"), with 23 years of experience, was one of the flight attendants.

---

1. In an Order dated January 27, 2014 [ECF No. 171], the Court determined Plaintiffs were not entitled to a jury trial.

2. Selected citations to the record are provided.

3. The purpose of having a check airman aboard a plane is to correct any noted violations of CAL standard operating procedures. Captain Dass noted no violations with flight BW 484.

It is not certain when Mr. Singh began to experience stroke-like symptoms, but from the collective memories of those who were present and testified, it appears to have been one-and-a-half hours into the flight that Ms. Singh noticed Mr. Singh was not feeling well, and she activated the in-flight call button to seek help from the flight attendants. A number of medical records state Ms. Singh reported her brother went to the plane's bathroom, returned, and had an "episode of emesis" at approximately 9:30 a.m. (Initial Neurological Exam by Dr. Sebastian Koch, Tr. Ex. 26, 1). Mr. Singh was losing consciousness and had slumped in his seat to his left side. Bissoondath–Santiago responded and, after observing Mr. Singh, believed he was having a stroke. Bissoondath–Santiago notified Blake, whose job as purser is to relay information regarding issues in the cabin to those in the cockpit, although it is unclear if Bissoondath–Santiago specifically informed Blake Mr. Singh was having a stroke. Blake did not think Mr. Singh was having a stroke when she initially observed him, as he was not exhibiting the typical symptoms of a stroke.

The CAL Safety and Emergency Procedures Manual ("CAL Safety Manual") states in the event of a stroke, crew should reassure the passenger and relatives, support any weak limbs, give oxygen if required, monitor the pulse and general condition, and note the level of consciousness every ten minutes. (*See* CAL Safety Manual, Ch. 10, § 1.9). Consistent with these instructions, the cabin crew gave Mr.

Singh oxygen. Nitroglycerin is not indicated for a passenger having symptoms of a stroke, but the crew improperly gave Mr. Singh a nitroglycerin tablet.[4]

Blake then notified the crew in the cockpit there was an ill passenger (although she did not mention he might be having a stroke) and the situation was being monitored. Had Blake advised Captain Shageer the passenger might be having a stroke, the Captain's response may have been different, as he may have considered diverting the plane to Puerto Rico after contacting medical personnel and the airport in Puerto Rico. According to Officer Nobrega, the cockpit crew was notified of the medical emergency approximately one-and-a-half hours into the flight. Again consistent with the CAL Safety Manual, Captain Shageer instructed Blake to keep the cockpit crew informed of the passenger's condition.

Some ten minutes later, Mr. Singh removed the oxygen and went to the bathroom. According to Blake, Mr. Singh's condition appeared to have improved. Upon his return to his seat, however, Mr. Singh vomited and his left side appeared paralyzed. Oxygen was again administered. Thereupon Blake notified the cockpit crew the situation had become serious.

CAL, like other airlines, uses MedAire/Medlink,[5] a company that provides airlines with emergency physicians for consultation via a radio frequency patch. But this service is not utilized immediate-

---

4. While the tablet should not have been given, as its effect is to lower blood pressure when the pressure should be kept high to assist a brain deprived of blood due to a blocked artery, the Court is persuaded by the medical testimony that a single 500 microgram tablet had no impact on Mr. Singh's treatment or his eventual outcome, as its effect would have lasted from four to five minutes only.

5. "MedAire" appears to refer to the "MedAire Commercial In Flight Services," a medical advisory service for medical emergencies that occur in the air and on the ground. (CAL Safety Manual, Ch. 10, § 1.5, Tr. Ex. 33). Use of the service is termed "Medlink." (*See id.*). The terms are used interchangeably in this Order, as they were so used in the testimony.

ly; according to Officer Nobrega many passengers who fall ill are fine ten to fifteen minutes later. Once the cockpit crew was informed there was a true medical emergency, and consistent with CAL procedures, the cockpit crew knew to contact MedAire/Medlink. Officer Nobrega asked Blake to gather certain information and include it on a "MedAire Patch Checklist," a form found in the CAL Safety Manual, such as the passenger's name, age, and medical history. This instruction was in keeping with CAL procedures addressing the handling of a medical emergency during flight. Blake obtained the MedAire information and returned to the cockpit.

Following CAL medical emergency procedures, Blake had previously used the plane's intercom system to page for any doctors who might be aboard the plane. Although he did not respond immediately, Mahmoud Sabha ("Sabha"), a second-year medical student, identified himself as someone who might be able to assist. He was asked to sit next to Mr. Singh and his sister. Upon gazing at Mr. Singh, Sabha believed he was having a stroke.

Once Blake gave Officer Nobrega the MedAire Checklist information, the cockpit crew requested a frequency clearance from Miami Air Traffic Control to secure a Medlink "patch." This process took another few minutes. A patch was connected between the service provider and the flight crew at approximately 9:50 a.m., but the conversation began at approximately 10:00 a.m. This call lasted approximately 20 minutes.

A Medlink operator, Michelle Tyler, spoke first with Officer Nobrega, and then about five minutes later a Medlink on-call physician, Dr. Robb Leigh ("Dr. Leigh"), was connected to speak with Officer Nobrega. The transmission made it very difficult for Medlink and the flight crew to communicate. When asked, Officer Nobrega informed Dr. Leigh Mr. Singh's symptoms had begun about an hour earlier, at approximately 9:05 a.m. Dr. Leigh advised there was a two-to three-hour window for dealing with stroke victims, so time was critical. Captain Shageer spoke with Dr. Leigh, and upon being asked, told the doctor two airports closer than Miami—the flight's final destination—were Nassau, Bahamas and San Juan, Puerto Rico. Both cities had medical facilities capable of treating Mr. Singh's stroke.

Of course, the airplane did not stop while the conversation, with its poor audio connection, was taking place. Consequently, while during the conversation initially the plane could have turned around and headed back in the direction of Puerto Rico, at some point Captain Shageer informed Dr. Leigh Puerto Rico was no longer a viable option but instead the plane could either land in Nassau at approximately 11:00 a.m. or arrive in its final destination, Miami, some thirty minutes later at 11:30 a.m. Dr. Leigh stated Mr. Singh needed to be at a hospital "within a couple more hours" and recommended the flight divert to Nassau as the "closest available airport." (Medlink Audio Recording, Tr. Ex. 1). Captain Shageer confirmed the doctor's recommendation, and directed Officer Nobrega to obtain clearance from Miami Air Traffic Control to divert the aircraft to Nassau. Officer Nobrega thereupon set an alternate course to Nassau.

But Captain Shageer had not landed in Nassau in 25 years. Captain Shageer followed principles known as "crew resource management" and "threat error management," which guide decision-making in response to incidents aboard aircraft. Under crew resource management, "[d]ecision making occurs after all relevant information has been gathered and any differences

or disagreements resolved, resulting in a clear plan of attack and brief in from all crew members." (CAL Operations Manual, 8.14.7, Tr. Ex. 34) (alteration added). Threat error management, in turn, requires one to slow down and act thoughtfully so an abnormal, non-routine situation does not impede the safe operation of a flight. Consistent with these industry principles, Captain Shageer believed a thorough and detailed approach briefing should be conducted before attempting to land in Nassau.

An approach briefing has several steps. It requires a review of an Automated Terminal Information Service, cross-checking the flight management computer, and reviewing altitudes and precision heights. This process normally takes between ten and twenty minutes. These steps should be completed before reaching top-of-descent, which generally occurs approximately twenty minutes prior to landing.

After ending his communication with Medlink, and again following CAL procedure and crew resource management principles, Captain Shageer spoke with CAL Systems Operations Control ("Operations Control") to determine the nearest suitable airport from a ground operations perspective. In this regard, the CAL Safety Manual states "[t]he Captain in conjunction with SOC will determine whether the flight will divert and the airport to which the diversion will occur." (CAL Safety Manual, Ch. 10, § 1.5) (alteration added). This conversation with CAL Operations Control took place between 10:23 a.m. and 10:28 a.m., some 35 minutes before Captain Shageer estimated arriving in Nassau and some 10 to 15 minutes before top-of-descent for a Nassau landing. CAL Operations Control, however, told Captain Shageer Miami was the more suitable airport for Mr. Singh as the ground staff in Nassau needed to arrange the diversion could

not be reached, whereas emergency medical arrangements were available in Miami. While he was on the call with CAL Operations Control, Captain Shageer was informed Mr. Singh was moving his arm and his condition appeared to be improving.

Captain Shageer ultimately made the decision to proceed to Miami as the most suitable location for Mr. Singh to receive expeditious and superior medical care, some ten to 15 minutes after Officer Nobrega had set an alternate course to Nassau. The Captain neglected to communicate this to Medlink, which went on to make arrangements in Nassau for medical services to respond to Mr. Singh. According to CAL's Vilma Wharwood, when MedAire recommends an aircraft land immediately, "that is what should be done." (Tr. Ex. 9, 43:20–25). Ms. Wharwood opines if Medlink tells the captain to divert and the captain decides not to, that is a violation of CAL's procedures. (See id. 65:10–16).

Nevertheless, the Captain believed his decision was consistent with Dr. Leigh's statement Mr. Singh should receive medical care within a "couple of hours." Again, the CAL Safety Manual states the Medlink physician "recommend[s] a diversion if necessary," but it is the captain, "in conjunction with SOC," who determines whether the flight will divert and the airport to which the diversion will occur. (CAL Safety Manual, Ch. 10 § 1.5) (alteration added). That MedAire advises rather than makes the diversion decision is consistent with the language of the CAL Safety Manual stating, "MedAire assumes legal liability for any advice given." (Id.).

The Captain also thought his decision prudent in light of Mr. Singh's noted improvement, the Captain's lack of familiarity with landings in Nassau, the additional time needed to perform a complete approach briefing for an unscheduled landing

in Nassau, the unavailability of ground support at the Nassau airport, the services available at the Miami airport for getting Mr. Singh to a hospital quickly, and better medical facilities and care in Miami as compared to those in Nassau (a point which Dr. Leigh in his testimony agreed with). Notably, careful consideration of Sabha's testimony shows Ms. Singh, in consultation with the flight crew, requested the flight continue to Miami rather than divert to Nassau. According to Sabha, Ms. Singh "said to go to Miami, agreed to go to Miami" (Sabha Dep., Ex. 10, 57:17–18 [ECF No. 213–2] ); in other words, "[s]he made the decision and then we all just went with it" (*id.* 58:13–14 (alteration added)). (*See also id.*, 23:13–25; 24:1–9; 39:15–25; 40:1–18; 41:5–13; 57:1–25; 58:1–25; 59:1–25; 60:1).

Flight BW 484 landed in Miami one hour and six minutes after the Medlink call ended. Before de-boarding, Ms. Singh expressed gratitude to Blake for landing in Miami, thanked her for all she had done for Mr. Singh, and gave her a hug. Emergency Medical Service ("EMS") reached Mr. Singh some fourteen minutes after landing and noted in its report Mr. Singh's symptoms had begun some two hours previously. Sabha and Ms. Singh agreed Mr. Singh's symptoms had begun some two to three hours prior to the plane's arrival, ultimately agreeing the time was closer to two hours before arrival, and told EMS this. Mr. Singh was admitted to the University of Miami Hospital at 12:04 p.m. Records relied upon by Keith Makkey, an airline flight operations specialist hired by Plaintiffs, show had the flight continued to Nassau upon being initially diverted, it would have landed at 11:02 a.m.

At the University of Miami hospital, Mr. Singh received administrations of tissue-type plasminogen activator both intravenously and intraarterially, but both inter-ventions were ultimately unsuccessful in "lysing" or unblocking the blood clot. Mr. Singh soon thereafter suffered hemorrhaging and cerebral edema, the latter of which prompted a craniotomy procedure. He was discharged from the hospital on December 27, 2011. In the year following his stroke, Mr. Singh experienced ongoing neurologic and neurosurgical issues including infections, seizures, new strokes on the right and left sides of the brain, left sided epidural, and a left brain decompression to reduce brain swelling. It is not possible to identify the extent to which Mr. Singh's current condition is attributable to each of these neurologic events.

Today, Mr. Singh suffers from maximum and severe widespread mental and cognitive impairments and severe physical deficits. While he worked successfully as a pool contractor at the time of the ill-fated flight, he has been unable to work since that date. Testimony produced at trial revealed he is incapable of independent living and lives with and relies on his sister for all of his care. Life planning experts and certified financial planners testified to the estimated losses to Mr. Singh and his family, including costs associated with life care plans and past and future lost earning capacity.

## II. CONCLUSIONS OF LAW

Under Article 17 of the Montreal Convention, a covered carrier has strict liability "for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, Article 17(1). To prevail on a bodily injury claim under the Montreal Convention, which governs the international air carriage of passengers, baggage, and cargo, a plaintiff

must establish: (1) the occurrence of an "accident" within the meaning of the Convention; (2) the "accident" occurred on the aircraft or during the embarking or disembarking process; and (3) the plaintiff suffered bodily injury caused by the "accident." *Siddiq v. Saudi Arabian Airlines Corp.*, No. 6:11–cv–69–Orl–19GJK, 2013 WL 2152566, at *5 (M.D.Fla. Jan. 9, 2013). While the parties framed the issues for trial in separate submissions in their Joint Pretrial Stipulation [ECF No. 188], they essentially agreed the Court would be asked to decide whether the events that transpired on flight BW 484 constituted an "accident" under Article 17 of the Montreal Convention, and if so, whether the accident caused Mr. Singh to sustain bodily injury and the extent of damage. (*See id.* 12–13, 15–16). Because the Court finds no "accident" occurred, it does not reach the causation and damages questions.

■ "The Montreal Convention, which came into force in the United States in November 2003, ... is the successor of the Warsaw Convention." *Weiss v. El Al Israel Airlines, Ltd.*, 433 F.Supp.2d 361, 364 (S.D.N.Y.2006) (alteration added; footnote call number omitted). "[M]any of the provisions of the Montreal Convention closely resemble those of the Warsaw Convention." *Id.* at 365 (alteration added). Consequently, "the case law regarding a particular provision of the Warsaw treaty applies with equal force regarding its counterpart in the Montreal treaty." *Best v. BWIA W. Indies Airways Ltd.*, 581 F.Supp.2d 359, 362 n. 1 (E.D.N.Y.2008); *Ugaz v. Am. Airlines, Inc.*, 576 F.Supp.2d 1354, 1360 (S.D.Fla.2008) (noting "it is appropriate to rely on cases interpreting the Warsaw Convention where the equivalent provision of the Montreal Convention is substantively the same").

In language nearly identical to Article 17 of the Warsaw Convention, the Mont-

real Convention provides that an air carrier may be liable on claims for bodily injury to a passenger of an international flight if "the accident which caused the ... injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

*Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F.Supp.3d 436, 441, No. 12–cv–2950 (ADS)(SIL), 2014 WL 4274071, at *6 (E.D.N.Y. Aug. 28, 2014) (quoting Montreal Convention, Art. 17(1)) (alteration in original).

■ On contradictory evidence, as was the case here on the parties' summary judgment briefings (*see* Order [ECF No. 203]), it is for the trier of fact to decide whether an "accident" took place and caused the passenger's injury. *Sook Jung Lee v. Korean Air Lines Co., Ltd.*, No. SACV 10–01709–JVS (MLGx), 2012 WL 1076269, at *3 (C.D.Cal. Mar. 21, 2012) (internal quotation marks and citation omitted). An "accident" under the Montreal Convention is "an unexpected or unusual event or happening that is external to the passenger." *Palma v. Am. Airlines, Inc.*, No. 09–23212–CIV, 2010 WL 5140592, at *3 (S.D.Fla. Dec. 9, 2010) (internal quotation marks and citation omitted). "This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Air France v. Saks*, 470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (citation omitted). Notwithstanding this flexible approach, "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 ... cannot apply." *Id.* at 406, 105 S.Ct. 1338 (alteration added). "The focus is on the cause of the injury, not merely

than an injury has occurred." *Palma*, 2010 WL 5140592, at *3 (citation omitted).

A number of cases have addressed under what circumstances an airline's failure to comply with its own policies and procedures aggravated a plaintiff's injuries associated with a medical condition, satisfying the definition of "accident" under the Montreal Convention. *See Safa*, 42 F.Supp.3d at 441, 2014 WL 4274071, at *6 (collecting cases). The general rule is that mere "[c]omplications arising from a passenger's medical conditions are not external to the passenger, and thus are not 'accidents' under the Montreal Convention." *Id.* (alteration added) (citing *Rajcooar v. Air India, Ltd.*, 89 F.Supp.2d 324, 328 (E.D.N.Y.2000) (finding a heart attack was not external to passenger, and thus was not an "accident" under the Warsaw Convention)). In contrast, "a flight crew's unexpected and unusual response to a passenger's medical condition is external to the passenger, and can be a Montreal Convention 'accident.'" *Id.* (quoting *Olympic Airways v. Husain*, 540 U.S. 644, 646, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004) (finding airline's failure to move an asthmatic passenger away from smoke during flight resulting in passenger's death was an accident under the Montreal Convention)).

In *Olympic Airways*, the Supreme Court gave as an example of an unexpected or unusual response a flight crew's disregard of industry standards and airline policy to divert a flight to the nearest airport when a passenger otherwise faces imminent death. 540 U.S. at 656, 124 S.Ct. 1221. Under circumstances where a plane is "within 30 minutes of a suitable airport, but the crew chooses to continue its cross-country flight, 'the notion that this is not an unusual event is staggering.'" *Id.* (citation and alteration omit-

ted). Following the instruction provided by *Olympic Airways*, courts have found satisfying the "accident" requirement depends on whether the flight crew responds to a passenger's medical emergency in an "unexpected" or "unusual" way.

Departures from industry standards as well as airline policies and procedures affect the outcome in determining whether an event is "unexpected" or "unusual." *See Rodriguez v. Ansett Australia Ltd.*, 383 F.3d 914, 919 (9th Cir.2004) (affirming summary judgment where plaintiff submitted no evidence that Air New Zealand failed to comply with any industry standard, nor any other evidence showing defendant's conduct rose to the level of an unexpected or unusual event or happening external to passenger who developed deep vein thrombosis, a blood clot); *Blansett v. Continental Airlines, Inc.*, 379 F.3d 177, 182 (5th Cir.2004) ("Some departures from an 'industry standard' might be qualifying accidents under Article 17, and some may not."). In *Sook Jung Lee*, 2012 WL 1076269, at *2, for example, the plaintiff suffered a stroke during the flight, and cabin crew began following Korean Airlines's policies and procedures for responding to in-flight medical emergencies. After completing several steps similar to those taken by CAL here, Korean Airlines diverted the aircraft. *See id.* The court examined plaintiffs claim directed at the crew's response to the medical emergency, as the response was something external to the plaintiff. *See id.* at *4 (citing *Aziz v. Air India Ltd.*, 658 F.Supp.2d 1144, 1148–49 (C.D.Cal.2009); *Fulop v. Malev Hungarian Airlines*, 175 F.Supp.2d 651, 663 (S.D.N.Y.2001) ("*Fulop I*")). The court determined there was no "event," given a statement made by an on-board physician for specialized care within six hours was heeded by the crew with the flight's diversion; and even if considered an "event,"

the crew's response was not "unexpected or unusual," as there was insufficient evidence the crew violated Korean Airlines' own policies and procedures. *Id.* at *5–6.

■ To be clear, imperfect responses to medical emergencies do not constitute an "accident," if the crew's response is not "unusual" or "unexpected." *See, e.g., Rajcooar,* 89 F.Supp.2d at 328 (holding absent a showing of unexpected circumstances, inadequate medical care did not constitute an "accident"); *Tandon v. United Air Lines,* 926 F.Supp. 366, 369–70 (S.D.N.Y.1996) (finding airline crew's failure to respond with adequate medical assistance to passenger suffering a heart attack was not an "accident"); *Abramson v. Japan Airlines Co.,* 739 F.2d 130, 132 (3d Cir.1984) (finding flight attendant's worsening of hernia condition was not an unusual or unexpected occurrence), *abrogated on other grounds, El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). In *White v. Emirates Airlines, Inc.,* 493 Fed.Appx. 526, 530–31 (5th Cir.2012), the decedent's son maintained the flight crew's noncompliance with his request to perform CPR or use a defibrillator on his mother was an "accident" even though the crew moved the mother to the floor, gave her oxygen, and alerted the captain, who arranged for medical assistance for decedent once the plane arrived. The court affirmed summary judgment for the carrier on the basis "even a flight crew's arguably imperfect response to a passenger's medical emergency does not necessarily constitute an Article 17 'accident.'" *Id.* at 531. Furthermore, the flight crew's failure to follow all relevant procedures in its manual was not unusual or unexpected where the plane was in its final descent when the flight attendant first discovered the decedent had collapsed in the lavatory, and the crew's ability to respond was limited by the short time it had to act and the need to ensure the safety of the other passengers and crew. *See id.* at 534.

In *Krys v. Lufthansa German Airlines,* 119 F.3d 1515, 1517 (11th Cir.1997), the passenger fell ill and contacted a flight attendant in the "early hours" of a transatlantic flight. A flight attendant requested any doctors on board to identify themselves, a doctor responded, and the doctor attended to the sick passenger, including by administering nitroglycerin. *See id.* The flight crew nevertheless proceeded to its destination across the Atlantic, relying on the medical passenger's advice. *See id.* The Eleventh Circuit affirmed the trial court's determination no accident had occurred under the Warsaw Convention despite the "close question" presented because any aggravation to the passenger's condition did not arise from any "unexpected or unusual event" but rather from the "passenger's own internal reaction to the usual, normal, and expected operation of the aircraft" in continuing from the scheduled point of departure to the scheduled point of arrival. *Id.* at 1521 (internal quotation marks and footnote call number omitted).

The decision in *Fulop v. Malev Hungarian Airlines,* 244 F.Supp.2d 217 (S.D.N.Y. 2003) (*"Fulop II"*), is also instructive. In *Fulop II,* when a passenger with a history of heart attack began experiencing chest pains sometime after take-off on a flight from Hungary to New York, he requested assistance from flight attendants who paged for a doctor on board and the doctor and crew tended to the passenger. *See id.* at 219. The possibility of diverting the flight to Great Britain or Ireland existed during the first two to three-and-a-half hours of the flight. *See id.* The captain was consulted, there was conflicting testimony whether the doctor on board or the passenger explicitly requested diversion,

and the captain ultimately decided not to divert the flight. *See id.* The airline had arranged for an ambulance to meet the aircraft, and the passenger thereafter underwent triple bypass surgery. *See id.* at 219–20. Following trial, the court entered judgment for the defendant, finding the airline employees had not materially deviated from internal procedures or industry standards in handling the medical emergency. *See id.* at 221. The court found the captain's decision not to divert the flight was made after taking into account considerations of safety and convenience, and the overall thrust of the on-board doctor's advice, rather than an outright rejection of the doctor's advice. *See id.* at 222.

In granting defendant summary judgment, the trial court in *Safa* similarly found no significant departure by the flight crew of Lufthansa policies and procedures relating to medical emergencies rising to the level of an unexpected event or "accident" under the Montreal Convention. 42 F.Supp.3d at 442, 2014 WL 4274071, at *7. In *Safa*, the passenger on a flight from Philadelphia to Frankfurt began experiencing chest pains, the crew was notified and responded, and doctors on board treated the passenger after the crew requested assistance. *See id.* at 438–39, 2014 WL 4274071 at *3. The captain was advised of the emergency situation and was mistakenly informed one of the doctors aboard was a cardiologist. *See id.* The captain ultimately chose not to divert the aircraft to closer airports, and an ambulance transported the passenger to the hospital, where he underwent surgery and treatment following a prolonged cardiac arrest in the ambulance. *See id.* at 439–40, 2014 WL 4274071 at *4. In evaluating Lufthansa policies and procedures, the court found no significant departure that could be described as unexpected and could be deemed an "accident" under the Montreal Convention. *See id.* at 442, 2014

WL 4274071 at *7. And in addressing the plaintiff's complaint about errors in the information flowing to the captain from the crew, the court noted "this specific complaint speaks to whether the response of the [flight] crew was adequate in a medical sense—a complaint which could not form the basis of a claim under the Montreal Convention—rather than whether the crew complied with Lufthansa policy and procedure." *Id.* at 444, 2014 WL 4274071 at *8 (alteration added).

While there are certain deficiencies in how the flight and cockpit crew, including the Captain, responded to Mr. Singh's on-board medical emergency, those deficiencies, whether considered in isolation or collectively, do not support the basis of a claim under Article 17 of the Montreal Convention. First, the flight attendants followed in all but one respect the procedures contained in the CAL Safety Manual and CAL Operations Manual for responding to stroke symptoms in passengers. The flight attendants responded to Ms. Singh's request for help, reassured Mr. Singh and his sister, administered oxygen to Mr. Singh, checked on him throughout the flight monitoring his condition, and saw him safely to EMT upon his arrival at Miami International Airport. The flight attendants solicited a doctor on board the flight to assist, and positioned the only passenger to respond, medical student Sabha, next to Mr. Singh. The attendants notified the cabin crew and Captain of the serious medical emergency and Mr. Singh's progress, and provided the checklist information Officer Nobrega and Captain Shageer used in seeking advice from MedAire/Medlink and Dr. Leigh.

The attendants' error in administering a single nitroglycerin tablet is not such an unusual or unexpected response so as to constitute an "accident." This is borne

out by the medical testimony indicating the administration of a single tablet had negligible effect on Mr. Singh's condition. Further, Blake's error in not initially communicating to the cockpit crew just how serious Mr. Singh's condition appeared is similarly not an unusual or unexpected event given Blake was still gathering information and most passengers who appear ill recover within 15 to 20 minutes of onset of symptoms. Once "stroke" appeared as the definitive diagnosis, Blake promptly returned to the cockpit and communicated that information.

Next, Captain Shageer followed the procedures contained in the CAL Safety and CAL Operations Manuals, as well as aviation practice including crew resource management, in making the decision not to divert the aircraft to Nassau, Bahamas, but rather proceed with the expected operation of the aircraft to Miami, while making provisions to ensure Mr. Singh was removed from the plane and transported immediately to a qualified hospital for emergency medical treatment. The CAL Safety Manual clearly indicates MedAire/Medlink offers *recommendations* and assumes liability for the *advice* it gives. The ultimate decision to divert is left to the captain, as stated in the CAL Operations Manual. Dr. Leigh advised Captain Shageer that Mr. Singh needed to be seen in a hospital in a "couple of hours" and "recommended" the plane divert to Nassau. The Captain initially heeded that advice by directing Officer Nobrega to change course.

But the Captain also had to address a number of other considerations regarding what was best for Mr. Singh as well as all of the other passengers and crew on board. He had not landed an aircraft in Nassau in 25 years. Principles of crew resource management required he gather all relevant information, resolve any differences or disagreements, and engage in a clear plan of attack after briefing from crew members. Threat error management compelled him to slow down and act thoughtfully so as not to impede the flight's safe operation. Consistent with industry practice and the CAL Operations Manual, Captain Shageer began a detailed approach briefing and made contact with CAL Operations Control. That consultation revealed Nassau ground staff could not be reached, while emergency medical services were available in Miami. During this process, the flight crew updated Captain Shageer on Mr. Singh's progress, describing an improved appearance, and advising Mr. Singh was now able to move his arm.

Because Dr. Leigh had told Captain Shageer Mr. Singh needed to be seen in a couple of hours, and in light of the proximity of Miami and the other complicating factors just described, the Captain made the decision to continue to Miami. In his mind, Miami offered Mr. Singh the possibility of superior medical care for little extra flight time. Indeed, Dr. Leigh testified proceeding to Miami was also an option given the "very tight time frame" involved with the medical emergency and the possibility delays could be encountered in Nassau, making the gain of approximately 30 minutes partially or totally wasted. (Robert G. Leigh Dep., Ex. 12, 86:12–87:7 [ECF No. 211–2] ). The Captain's error in not communicating to MedAire/Medlink his final decision is also not such an unusual or unexpected event that it should give rise to finding an "accident" occurred, particularly where EMT was on the ground and promptly assisted Mr. Singh upon the plane's arrival in Miami. That emergency personnel were also on the ground at the airport in Nassau is of no moment, especially in light of the information conveyed to Captain Shageer as he determined the best course of action.

Finally, CAL did not disregard any explicit health-based request given by Mr. Singh or his sister ·to divert the aircraft. Quite the contrary, the Court found credible testimony given by Sabha—who has no bias or interest in the outcome of this case—that Ms. Singh requested the plane continue to Miami where her brother could receive quality medical care.

### III. CONCLUSION

The events of December 15, 2011, and the suffering experienced by Mr. Singh and his family as a result of Mr. Singh's stroke aboard CAL Flight BW 484 are deeply tragic, and merit great sympathy. Lives have been forever altered. Nevertheless, sympathy cannot affect the Court's determination. In light of all of the evidence presented at trial, the undersigned concludes Plaintiffs have not established Mr. Singh's injuries were the result of an "accident" as that term is defined under the Montreal Convention, for which Defendant may be held responsible. The Court by separate order will enter final judgment in favor of Defendant, Caribbean Airlines Limited, and against Plaintiffs.